## In the matter of CARTER, an habitual drunkard.

Where the court designates the master to take an account between a committee of an habitual drunkard and the estate, it is irregular and improper for the parties to change the master, for the discharge of this duty, without the sanction of the court.

If the committee of an habitual drunkard neglects to file an inventory of the estate, or to render his accounts regularly under oath, as required by the 154th rule, in the settlement of his accounts every presumption will be taken most strongly against him.

The committee of an habitual drunkard, who holds a mortgage against the estate, cannot, without the sanction of the court, enforce it by proceedings of foreclosure under the statute.

Where the committee has been guilty of gross negligence, he will be decreed to pay the costs of the proceedings against him to obtain his removal and the settlement of his accounts.

March 6.

THE petition in this case stated among other things, that in 1822, R. Carter was found to be an habitual drunkard, and incapable of conducting his own affairs, and that B. Eldridge was appointed his committee. That Carter at that time owned a house and lot, on which the committee held a mortgage, executed a few months before, and that he was also possessed of a large personal estate. That the committee had neglected to keep any account, or to file any inventory of Carter's estate ; that he had kept the monies and proceeds of the estate mingled with his own, and had wasted the estate ; and that he had advertised, and was about to sell the real estate under his mortgage by a foreclosure under the statute. Upon the presentation of the petition to the chancellor, and upon the hearing of the parties, it was referred to D. Andrus, one of the masters of this court, to ascertain and report upon the truth of the principal matters and facts alleged in the petition, and to take an account between the committee and the estate of Carter ; with liberty to the petitioners to examine the committee on oath, before the master, as to the matters of the reference. In the mean time the committee was prohibited from interfering with the estate, and from all further proceedings to foreclose the mortgage by advertisement under the statute. The solicitors for the petitioners and for the committee, by a stipulation be-

tween themselves, and without any authority from the court, agreed to change the master, who had been designated by the court to examine as to the matters of the petition, and to take the account. A report was accordingly made by such substituted master, to which both parties took exceptions ; and the case was brought on to be heard upon the exceptions, and for a final order on the petition.

*A. Stewart,* for the petitioners.

*J. Seelye,* for the committee.

THE CHANCELLOR. There has been very great irregularity in conducting the proceedings in this case, which it is impossible now to correct. The formal answer filed to the petition was wholly irregular and unauthorized ; and the statements therein cannot be received as evidence in favor of the committee, although they may be considered as directly responsive to the allegations in the petition. The order of the court authorized the petitioners to examine the committee, on oath, before the master. And so far as he has responded to the interrogatories put to him by the counsel of the petitioners on the reference, the answer to such questions are evidence in his favor. But even such answers are not evidence as to any matters not directly or properly responsive to the inquiries thus made. In a case of this kind, where the rights of Carter were under the special care and protection of this court, it was also irregular and improper for the parties to change the master, who had been designated by the chancellor for the performance of this duty, without the express sanction of the court. It is doubtful, at least, whether those parties who were competent to judge of, and to protect their own rights, have not deprived themselves of the power to except to the decision of the person whom they have authorized to arbitrate these matters between them, and who was not legally authorized to execute this order. But as both parties have undoubtedly acted under a mistake in this matter, and there is no doubt as to the ability and integrity with which the sub-

stituted master has executed the order, under their stipulation, I shall proceed to dispose of this matter upon the merits.

There has been gross neglect, if not misconduct, on the part of this committee in the manner in which his accounts of this estate have been kept, and in not filing an inventory, as required by law. The act of the 20th of March, 1801, (1 *R. L. of* 1813, 147, § 2,) made it the duty of the committee of a lunatic to file an inventory of the whole real and personal estate on oath, with the register of this court, within six months after his appointment. A similar jurisdiction to that exercised by this court in the cases of lunatics was, by the act of March, 1821, conferred upon the court in relation to the estates of habitual drunkards. It was the duty of this committee, before he undertook to execute such a trust, to ascertain what he was to do in the faithful execution thereof. And it would be dangerous to sanction the principle that an officer of this court is to be excused for a palpable neglect of duty, on the ground that he was so ignorant as to be wholly incompetent to the discharge of the trust conferred upon him. By the 45th rule of the court, which was in existence at the time this appointment was made, and which must have been furnished to this committee or to his solicitor at that time, he was required to render periodical accounts of his trust; which he has wholly neglected to do. But even admitting that he was ignorant of his duties, under the statute and the rules of the court, I cannot believe he did not know it was necessary for him to make some memorandum or statement of the property, effects, notes, &c. of Carter, so that he might be able to render an account thereof, according to the conditions of his bond. In consequence of this gross neglect on the part of the committee, every thing in relation to this estate must be construed most strongly against him. Whereas, if he had filed an inventory and had rendered his accounts regularly, every presumption in reference to the fairness and justness of those accounts would have been permitted to operate most strongly in his favor. Under the circumstances of this case, if the counsel for the petitioners had produced the inquisition finding the value of the personal property to amount to a specific sum, or if there were any oth-

er data by which the court could be governed in fixing the amount, I should consider it my duty to charge this committee with the utmost farthing which this estate might have been made to produce by proper care and management. I have some doubts whether I ought not to charge him with the balance of every account which stood open upon the books of Carter, at the time he assumed the trust, and with every note identified as having come to his hands, which he has not shown affirmatively was not due and collectable. But I fear that in doing so, I should do greater injustice to him than I can do to the estate, by leaving the report as it now stands ; from which it is evident that the master has, in most cases, thrown the burthen of proof on the petitioners.

A few of the exceptions on each side I shall briefly consider. The first relates to the money which Carter had on hand at the finding of the inquisition. It appears this money, amounting to $250, was in the hands of the wife, who, with the consent of Eldridge who was present, consented to give to Carter $100 of this money, provided he would deliver up his notes and accounts then in his possession. This was nearly a month before Eldridge was appointed the committee; and he had therefore no control over this money, and had no legal right to take the notes and accounts from the possession of Carter. The paying over the money was the act of the wife, and the interference of Eldridge was only as a neighbor and a friend. He cannot therefore be charged, as the committee, for the loss of this money; although this court would probably have protected him, or any other friend of the family, who in good faith had taken these notes and accounts by force from the possession of the drunkard, to save them from destruction. The residue of the money, which remained in the hands of the wife at the time of Eldridge's appointment, he had a right to claim ; and it was his duty to receive it from her and to apply it to the payment of the debts. Upon a proper application, this court could have compelled her, or any other person who was holding the property of the drunkard without any pretence of claim, to deliver the same over to the committee. I think, however, from the evidence in the case, it may fairly be presumed that this money has been all expended for

the benefit of the family, when the wife and children were driven from home by the violence of the drunkard, and at other times. And as the rights of creditors are not concerned, I see no reason for charging the committee with any part of the money left with the wife, although he evidently neglected his duty in not receiving it, and seeing to the proper disposition thereof himself.

I do not see any sufficient evidence in the case to charge the committee with the notes sold by Carter after the finding of the inquisition, or to satisfy me that the committee received any more notes than the master has held him accountable for. Beekman's testimony is too loose and indefinite to authorize the court to charge the committee with any specific amount, in notes, as having been received by him. If it had distinctly appeared that the committee had been seasonably informed of the sale and giving up of notes by Carter, after the finding of the inquisition, as all those acts were absolutely void, he would have been chargeable with neglect in not pursuing the securities into the hands of those who had thus improperly obtained them. The committee was probably negligent in not making the proper inquiries as to these matters immediately after his appointment; but, from the testimony, I cannot say that if inquiries had been made, he would then have elicited sufficient information to have enabled him to save any thing for the estate. According to Beekman's own account he was concerned in the fraud, in buying from this drunkard his notes, after the finding of the jury; and it is therefore hardly probable that he gave the committee any information as to that fraud, in time to enable him to charge the witness with the amount in a court of justice.

The committee was properly charged with the value of the one horse waggon, as he has suffered it to be applied in payment of a drunkard's bill, of Carter, which never could have been collected. The bill for Carter's work also belonged to the committee; and he had no right to permit either to be set off against the grog bill. Carter was not legally competent to contract any debt, so as to make it a legal subject of set off; and the tavern bill of a drunkard cannot form the foundation of an equitable claim. I think, however, the claim for inter-

est should be disallowed, on the ground that the master has in fact allowed about the fair cash value of the waggon, including interest. In this case, I do not think the nominal value of the waggon was its actual value ; but the committee was chargeable with interest, which makes the amount allowed by the master about the proper charge.

The exception of the committee that the master has not allowed the whole $40, paid by him to J. Seelye, cannot be sustained. The statute, under which the proceedings were had, expressly limited the expenses, chargeable on the estate of the drunkard, to $25 when there was a traverse of the inquisition, and to $15 where there was none.

The charge for money paid Huff on Carter's note was wholly unauthorized. Even if that note was taken into consideration in the *jumping* settlement made between the attorney of Huff and Eldridge, *as to their own private accounts, no data are furnished* by which any thing can be allowed to the committee in relation to that settlement. It is pretty evident, however, that Eldridge obtained at that time all that he had any equitable right to claim as between him and Huff's assignees, without reference to the Carter note. If any thing was actually due on the Carter note, the assignees of Huff had as much claim therefor, upon the estate of Carter, after as before they allowed the claim of Eldridge. No receipt was given by the assignees, and this claim was not even mentioned to them, having been deducted from any balance due to Eldridge in his own right.

The charge of $250 for boarding the wife and family of Carter was also properly disallowed. Some part of the charge must run back even beyond the time when the accounts of Carter and Eldridge were settled, previous to the finding of the inquisition. That part which has taken place since the appointment of the committee stands on no better footing. It was a gross neglect of duty on the part of the committee to permit this brutal husband to occupy the property committed to his care and management, and to destroy and waste the same, or to use it for the purpose of supplying himself with liquor, and to permit him to drive his wife and family from their house in his fits of intoxication. The whole object of the appointment of a committee, in this case, was to preserve

the property, and to protect the family from the effects of the drunken fits of Carter.   But from the manner in which this estate has been managed, it certainly would have been safer in the hands of Carter, with his occasional drunken fits, than under the management of this committee.   By the neglect of the committee, there is reason to believe a considerable part of the property has been wasted.   The committee and his family have, out of the proceeds of a part of the property, furnished Carter with the means of intoxication ; and in his fits of intoxication, he has been allowed to destroy and waste the rest. It is evident that this account, and also that referred to in the ninth exception, were not entered on the books of the committee at the time the services purport to have been rendered ; and that they have been trumped up for the purpose of sustaining the unjustifiable proceeding of sacrificing the real estate under the mortgage.

Perhaps some few of the exceptions on each side are technically well taken ; but as both parties have requested the court to dispose of this case without sending it back to a master, I shall not attempt to go through all of the exceptions, or to make any special order as to the allowance or disallowance of each.   The result of such a proceeding would be to charge the committee with something more than has been allowed by the master, after allowing all exceptions properly taken on his side.   But I think it would not be of sufficient benefit to the family of this unfortunate man, to justify the extra trouble and expense of re-stating the accounts.   I shall therefore direct the master's report as to the facts in the case, and as to the balance of $15,19, by him reported due to the estate, to be confirmed ; but without deciding as to the correctness of each item in the account, from which he has ascertained that balance to be due.   By any other course it would be impossible to do justice between these parties, without sending the accounts to a new master to be re-stated on different principles ; the master who took the accounts being no longer in office.

The proceedings by the committee to foreclose the mortgage, when there was nothing due thereon, are wholly unjustifiable.   Even if the whole amount had been due, this was not a case in which the committee, so long as he retained that

trust, could foreclose the mortgage, except under the express sanction and direction of this court. His interest as mortgagee conflicted with his duty as committee, and the statute foreclosure, under such circumstances, could not be resorted to. As he has gone on since he had notice of the intention to present this petition, and has sold the property, and caused it to be bid in for his own benefit, he must, at his own expense, execute a re-conveyance to the drunkard, and cause the same to be recorded in the proper office, with proper covenants to be inserted in the deed, that he has neither done or suffered any act by which the title to the property has been or may be encumbered or impaired. And he must cause the bond and mortgage to be cancelled, and the mortgage to be discharged from the record. He must also be immediately removed from his trust as committee, and within thirty days after notice of the order, he must pay to the register of this court the sum of $15,19, so found due from him by the master, with interest thereon from the date of the master's report ; and also deliver to the register the bond and mortgage duly cancelled, and the deed of re-conveyance duly recorded as aforesaid.

Under the circumstances of this case, as all the costs and expenses to which this estate has been subjected have been owing to the gross negligence if not the wilful misconduct of this committee, I should be doing injustice to the petitioners, and an injury to the community, if I did not charge him with the taxable costs of these proceedings. The counsel for the petitioners also asks that the committee may be charged with a reasonable counsel fee to remunerate him for his services on this protracted investigation. That, however, would be going farther than I feel disposed to go in this case. It is obvious that even the taxable costs will be very heavy ; and I think neither party should be allowed costs on the exceptions to the master's report. But the solicitor for the petitioners will be entitled to the usual costs, as upon a special motion, on his application for this final order on the coming in of that report.

It must also be referred to one of the masters of this court residing in the county of Otsego, to enquire and report who

would be a suitable and proper person to be appointed committee of the person and estate of Reuben Carter, and to approve of two sufficient sureties for such committee in the sum of $1000 each. The wife of Carter must have notice to appear before the master, and be permitted to name a suitable person as committee, and any of the adult children of the drunkard are to have the like permission. And upon the appointment of the new committee, Barnarbas Eldridge is to deliver over to him, on oath, all the books, papers and property belonging to the estate, together with all monies which have come to his hands, as such committee, since the date of the master's report which has been made in this matter.